[No. B180181. Second Dist., Div. Eight. Sept. 22, 2005.]

DOE 1 et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES et al., Real
Parties in Interest.

## COUNSEL

Law Offices of Guzin & Steier and Donald H. Steier for Petitioners.

No appearance for Respondent.

Hennigan, Bennett & Dorman, J. Michael Hennigan, Donald F. Woods, Jr., and Jeffrey S. Koenig for Real Party in Interest The Roman Catholic Archbishop of Los Angeles.

Kiesel, Boucher & Larson, Raymond P. Boucher, Patrick DeBlase and Anthony M. De Marco for Real Parties in Interest and All Interested Plaintiffs.

## OPINION

**RUBIN, J.**—Petitioners—26 Catholic priests—have asked us to stop the Los Angeles Archdiocese from disclosing written summaries made of the personnel records of numerous priests accused of sexually molesting minors. Because those summaries were prepared for purposes of an ongoing mediation process, contain admissions of liability by the Archdiocese, and reveal something about the mediation discussion, we agree that their disclosure would violate the mediation confidentiality privilege. (Evid. Code, § 1122, subd. (a)(2).) We therefore issue a writ prohibiting their release.

### FACTS AND PROCEDURAL HISTORY

The Roman Catholic Archbishop of Los Angeles is the principal defendant in nearly 500 lawsuits based on allegations that various priests committed acts of childhood sexual molestation on the plaintiffs.[1] In July 2003, Judge Peter D. Lichtman was appointed as the settlement and mediation judge. Shortly thereafter, the Archdiocese offered to prepare written summaries of its personnel and other files concerning more than 100 priests who had been identified as molesters by the *Clergy Cases I* plaintiffs.[2] The summaries, which the Archdiocese called "proffers," would allow disclosure for mediation and settlement purposes of the contents of its files to the extent they reflected notice to the Archdiocese of an accused priest's propensities toward child molestation before the alleged misconduct took place. Based on the contents of its files, the Archdiocese would, in some instances, concede the notice issue by stating that it would "not contend that it lacked notice of offender's sexual interest toward minors following this report." The purpose behind this procedure was to prevent disclosure of communications that the church believed were privileged and to avoid protracted litigation over certain constitutional and evidentiary privileges to the contents of the files that were asserted by the priests and the Archdiocese.

As part of this process, which the parties dubbed the "proffer protocol," retired Judge Lester E. Olson was appointed to assist Judge Lichtman. The Archdiocese prepared its proffers, then turned over to Judge Olson the proffers and the files from which the information was derived. Judge Olson cross-checked the contents of the files with the proffers to ensure that the

---

[1] The many actions against the Roman Catholic Archbishop of Los Angeles were coordinated with multiple-plaintiff actions against other California archdioceses and are known as *Clergy Cases I*. The Roman Catholic Archbishop of Los Angeles is sometimes referred to as the Los Angeles Archdiocese. We will hereafter refer to the Archbishop as the Archdiocese or the church. Because the plaintiffs and the Archdiocese are the real parties in interest, we will sometimes refer to them collectively as real parties.

[2] Some of those priests were named defendants, while others were merely identified as alleged molesters.

summaries were accurate and complete. Proffers that were not accurate or complete were then revised by Judge Olson. At the end of this lengthy process, the completed proffers of 118 priests were placed in a sealed packet by Judge Olson and delivered to Judge Lichtman on November 15, 2004.

The proffers from the 26 priests-petitioners were included in the record of this writ proceeding. Each one lists the dates and locations of a priest's work assignments for the Archdiocese. As to some, a skeletal description of complaints concerning molestation or other sexually inappropriate behavior is set forth. Some also mention that a particular priest was referred for psychological treatment, including the locations of such treatment. A few mention treatment for other problems. Eight of the proffers include a statement by the Archdiocese that, as of the date of a certain sexual misconduct report, the Archdiocese would not contend it lacked notice of that priest's sexual interest in minors. From the start of this process, the Archdiocese made clear that it intended to release publicly the proffers once they were completed. Also from the start, counsel for petitioners, some of whom were named defendants, objected to the compilation and disclosure of the proffers on various grounds, including the constitutional right to privacy, the priest-penitent privilege, and the psychotherapist-patient privilege. Judge Lichtman issued orders overruling those objections because the church was turning over its files for settlement purposes only and because the priests' objections were not yet "implicated." Judge Lichtman also ruled that the information exchanged as part of the proffer process was covered by the mediation confidentiality privileges found in the Evidence Code. Petitioners agreed to defer a motion on the propriety of publicly disclosing the proffers until a later time.

In December 2004, after the proffer protocol was completed and public disclosure of the proffers appeared imminent, petitioners brought a motion for a protective order to halt the planned disclosure. In addition to the privacy and privilege issues raised before, the priests also objected that release of the proffers violated the mediation confidentiality privilege. (Evid. Code, § 1122.)[3] When that motion was denied by trial Judge Haley J. Fromholz, the priests petitioned this court to reverse the trial court's order and stop any public disclosure of the proffers. After we summarily denied the petition, the California Supreme Court, acting on a petition for review of our decision, granted that petition, transferred the matter back to us with directions to issue an order to show cause why the petition should not be granted, and enjoined the Archdiocese from disclosing the proffers pending a further order from this court.

---

[3] All further undesignated section references are to the Evidence Code.

## DISCUSSION

1. *Disclosure of the Proffers Would Violate the Applicable Mediation Confidentiality Statutes*

██ California's Legislature has a strong policy favoring mediation as an alternative to litigation. Because mediation provides a simple, quick, and economical means of resolving disputes, and because it may also help reduce the court system's backlog of cases, it is in the public interest to encourage its use. (*Rojas v. Superior Court* (2004) 33 Cal.4th 407, 415 [15 Cal.Rptr.3d 643, 92 P.3d 260] (*Rojas*).) Confidentiality is considered essential to effective mediation because it allows for frank and candid discussions by the parties without fear that adverse information presented during a mediation will be used against them later. Therefore, one of the Legislature's fundamental means of encouraging mediation has been the enactment of mediation confidentiality provisions. To ensure confidentiality, the statutory scheme unqualifiedly bars disclosure of specified communications and writings associated with a mediation absent an express statutory exception. (*Id.* at pp. 415–416.) This policy is expressed by section 1119, which provides, in relevant part: "(c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."[4]

The applicable statutory exception to this rule is found in section 1122, subdivision (a), which provides that a communication or writing made or prepared for, in the course of, or pursuant to, a mediation, is not made inadmissible or protected from disclosure if either of the following conditions is satisfied: "(1) All persons who conduct or otherwise participate in the mediation expressly agree in writing, or orally in accordance with Section

---

[4] Subdivisions (a) and (b) of section 1119 forbid the disclosure or discovery in various civil, criminal, and administrative proceedings, of writings prepared as part of a mediation, as well as of evidence of anything said or any admissions made as part of a mediation. Subdivision (c) deals with the related and broader subject of confidentiality. At oral argument, the Archdiocese contended for the first time that the "communications" referred to in subdivision (c) must not include the writings referred to in subdivision (b). Because the Legislature used "writings" in one instance and "communications" in the other, it must have intended those terms to have different meanings. As we understand the argument, this means that while mediation writings are not admissible or discoverable, and cannot be disclosed in an evidentiary hearing, writings such as the proffers which are not "communicative" in nature are not confidential under section 1119 subdivision (c). Rather than dive into the exegesis of linguistic minutiae required by the rules of statutory interpretation, we hold that such a cribbed interpretation of the term "[a]ll communications" in subdivision (c) of section 1119 is contrary to the broad reach our Supreme Court has given to the various mediation confidentiality provisions. Instead, "communications" under subdivision (c) includes "writings" as defined in subdivision (b). Nothing in the Law Revision Comments to section 1119 or its predecessor, section 1152.5, suggests otherwise.

1118, to disclosure of the communication, document, or writing.[5] [¶] (2) The communication, document, or writing was prepared by or on behalf of fewer than all the mediation participants, those participants expressly agree in writing, or orally in accordance with Section 1118, to its disclosure, and the communication, document, or writing does not disclose anything said or done or any admission made in the course of the mediation."

### A. The Proceedings Below Were a Mediation, Not a Mandatory Settlement Conference

At oral argument, real parties contended for the first time that the process occurring below might not be a mediation at all, but instead might be a mandatory settlement conference under rule 222 of the California Rules of Court, and is therefore exempt from the mediation confidentiality rules. (§ 1117, subd. (b)(2).) As real parties stated during oral argument, the court used the terms "mediation" and "settlement" interchangeably when referring to the process taking place. We also recognize the conceptual difficulties in distinguishing between a mediation and a settlement conference when a bench officer is presiding at those talks. Because the record so clearly shows that the parties were mediating, we do not believe those abstract distinctions apply here. The initial case management order of September 15, 2003, discussed the effect of certain answers or demurrers "in the initial mediation phase" and "[w]hile these cases are in mediation." The September 5, 2003, order appointing Judge Olson states that Judge Lichtman was appointed to conduct settlement conferences and report to the court on the progress of the mediation. In the December 8, 2004, order denying petitioners' motion for a protective order, the trial court noted that the proffers were prepared "for purposes of mediation and settlement." The record is replete with numerous other references to an ongoing mediation. The court's interchangeable use of the term "settlement" does not lead to a contrary conclusion, especially considering that the obvious and commonsense intended result of a mediation is to reach a settlement. Nowhere in the record are Rules of Court rule 222 or the term "mandatory settlement conference" mentioned.

██ If counsel wish to avoid the effect of the mediation confidentiality rules, they should make clear at the outset that something other than a mediation is intended. Except where the parties have expressly agreed

---

[5] Section 1118 requires that an oral agreement be recorded by some reliable means, that the agreement's terms are recited on the record in the presence of the parties and the mediator, that the parties express their agreement to those terms and acknowledge that it is enforceable and binding, and that the terms be reduced to writing within 72 hours after it was recorded. (§ 1118, subds. (a)–(d).)

otherwise, appellate courts should not seize on an occasional reference to "settlement" as a means to frustrate the mediation confidentiality statutes.[6]

### B. *Release of the Proffers Violates Section 1122, Subdivision (a)(2)*

Real parties contend that subdivision (a)(2) of section 1122 applies because the church, which prepared the proffers, consents to their disclosure, and the proffers do not disclose anything said or done, or any admissions made in the course of the mediation. As set forth below, because the proffers reveal admissions made by the Archdiocese, as well as its position on other issues regarding liability, the proffers may not be disclosed under that provision.

Case by case, the church's liability depends in part on whether it had notice that a particular priest was at risk for molesting young parishioners.[7] Eight of petitioners' 26 proffers included statements by the Archdiocese that, as of the date of a specified report of child molestation, it would not contend that it lacked notice of that priest's sexual interest in minors. Petitioners contend those statements are admissions that bar disclosure of the proffers. We agree.[8] In opposition to petitioners' motion for a protective order, the church filed a document with the court that stated its position regarding release of the proffers. After briefly describing the intent behind the proffer protocol, the church stated: "In those cases where the Archdiocese in good faith was willing to *concede* notice of propensity for mediation and settlement purposes, it agreed to state the event of notice followed by the statement that 'The Archdiocese will not contend that it lacked notice of offender's sexual interest toward minors following this report.' " (Italics added.) The church therefore characterized these statements as concessions, a term which our courts have long used interchangeably with "admissions." (See, e.g.,

---

[6] Real parties also contend that the mediation confidentiality privilege does not apply because the proffers were not prepared as part of the mediation process. This contention merits little discussion. It is obvious from the history of the proffers that their sole purpose was to foster the mediation process. In an October 9, 2003, order, Judge Lichtman ruled that all personnel files, proffers, and other documents "exchanged in the settlement process" were not to be disclosed except to the parties and their lawyers, including staff members "with reason to access the materials for settlement/mediation purposes." In the Archdiocese's formal position regarding release of the proffers, it stated that they were prepared "for purposes of mediation and settlement . . . ." In the December 8, 2004, order denying petitioners' motion for a protective order, the trial court noted that the proffers were prepared "for purposes of mediation and settlement." The record abounds with other similar statements. In short, there can be no doubt that the proffers were prepared for the purpose of, in the course of, and pursuant to, a mediation. (§ 1122, subd. (a).)

[7] In a case management conference statement prepared by plaintiffs, they said that "[a] significant question for the plaintiffs in evaluating mediation and settlements centers upon the churches [*sic*] knowledge and the content of documents in their possession which might shed light on the issue of notice."

[8] The Archdiocese conceded this point at oral argument.

*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 [112 Cal.Rptr. 786, 520 P.2d 10], disapproved on another point in *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 944 [154 Cal.Rptr. 503, 593 P.2d 200]; *Bradley v. Clark* (1901) 133 Cal. 196, 210 [65 P. 395]; *People v. Zichko* (2004) 118 Cal.App.4th 1055, 1059 [13 Cal.Rptr.3d 509]; *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1066, fn. 4 [14 Cal.Rptr.2d 604].) Accordingly, it is difficult to characterize the church's concessions as anything other than admissions regarding their notice of wrongdoing by certain priests, at least for purposes of mediation.[9]

■ It is not just the admissions which bar disclosure of the proffers, however. The flip side of those admissions is presented by the remaining proffers, where the church did not concede notice of a priest's sexual interest in minors. By contrasting those proffers with the others that included the admissions, it is possible to determine those priests as to whom the Archdiocese intends to assert during the mediation that it had no such notice. Section 1122 " 'facilitates admissibility and disclosure of unilaterally prepared materials, but it only applies so long as those materials may be produced in a manner revealing nothing about the mediation discussion.' " (*Rojas, supra*, 33 Cal.4th at p. 421, quoting Cal. Law Revision Com. com., West's Ann. Evid. Code (2004 Supp.) foll. § 1122, p. 156.) Under that guideline, the proffers may not be disclosed because they also reveal something about the mediation discussion—the position the church has staked out for mediation purposes regarding priests as to whom it supposedly had no notice of their sexual interest in minors.

### C. *Because Petitioners Were Mediation Participants, Section 1122, Subdivision (a)(1) Does Not Apply*

■ Section 1122, subdivision (a)(1), allows for the disclosure of mediation communications if all mediation participants agree to the disclosure. Plaintiffs contend that disclosure of the proffers is also permitted under that section because petitioners did not participate in the mediation and, as a

---

[9] We recognize that the church is trying to release its own admissions, not those of some other party. Arguably, such a disclosure does not jeopardize the policy behind mediation confidentiality because disclosure is sought by the party against whom the admission might be used. However, section 1122 does not make such a distinction. Instead, it prohibits the disclosure of *any* admission, without qualification. Given our Supreme Court's insistence on preventing disclosures absent an express statutory exception (*Rojas, supra*, 33 Cal.4th at pp. 415–416), we believe section 1122, subdivision (a)(2) prevents the disclosure of admissions even by the party who made them. We can imagine that in some situations a party's purported "admission" might be a disguised accusation of another's misconduct. Drawing fine lines in this area seems counter to the policy embodied in *Rojas*.

result, all participants have agreed to their release.[10] Because petitioners did no more than object to the disclosure of the contents of their personnel files, and did not take part in any discussions relating to liability or geared toward actually resolving the actions, plaintiffs contend petitioners cannot be considered mediation participants. We disagree, because petitioners' participation was extensive enough to characterize them as mediation participants.

In *Travelers Casualty & Surety Co. v. Superior Court* (2005) 126 Cal.App.4th 1131, 1146, footnote 18 [24 Cal.Rptr.3d 751], we indicated that mediation participants included both parties and nonparties who attend or take part in a mediation. If the petitioners here were all nonparties whose only role in the process had been to prevent the release of information from their personnel files, we believe it would be hard to characterize them as mediation participants. The record here, although less than clear, leads to a different conclusion. First, several of the petitioners were parties and, at some point, would have to agree to any global settlement proposed by the church and the plaintiffs.[11] Thus, even if the plaintiffs and the church had been the only parties yet to take part in true settlement negotiations, petitioners would have to be brought in at some point before any settlement could be reached. The church itself acknowledged this point in its supplemental briefing on the issue, conceding that the petitioners were in fact mediation participants. As a result, the context for the petitioners' mediation-related activities suggests that they were more than mere bystanders with objections to raise. Instead, although their participation had not yet fully ripened, they still had a critical role to play.

Second, we have gleaned a few factual kernels from the record that suggest a greater role than plaintiffs have acknowledged. A September 23, 2003, minute order lists petitioners' counsel as one of the lawyers present where the court addressed settlement discussions, including the exchange of information necessary to continue settlement talks. In an order dated January 16, 2004, Judge Lichtman said that the protocols were established through "settlement negotiations" with the "represented parties," which presumably included those petitioners who were named defendants. On this unique record, we are loath to hold that petitioners did not participate in the mediation without a

---

[10] We asked for and received supplemental briefing from the parties on this issue, which was raised below, but not addressed by the parties' writ briefs. Although plaintiffs contend petitioners were not mediation participants, the Archdiocese believes they were.

[11] For instance in an August 10, 2004, order, Judge Fromholz stated that "settlement negotiations are ongoing and are in the process of being expanded to include parties in addition to the Plaintiffs and the Dioceses . . . ."

clearer factual showing. Accordingly, we presume that petitioners were mediation participants for purposes of section 1122, subdivision (a)(1).[12]

2. *Barring Release of the Proffers Is Not a Prior Restraint of Free Speech*

Plaintiffs contend that an order barring the Archdiocese from releasing the proffers would act as a prior restraint on free speech in violation of the First Amendment. The basis of this argument is the decision in *Seattle Times Co. v. Rhinehart* (1984) 467 U.S. 20 [81 L.Ed.2d 17, 104 S.Ct. 2199] (*Seattle Times*). In that case, the United States Supreme Court considered whether parties to a civil action may publish before trial information gained through pretrial discovery. The defendant, a newspaper that had been sued for defamation, wanted to print a news story based on information learned through discovery. When the plaintiff obtained a protective order barring publication, the newspaper appealed, contending that information obtained through civil discovery was protected by the First Amendment because it is no different from other sources of information. The Supreme Court rejected the argument.

In examining the issue, the *Seattle Times* court asked whether the protective order furthered an important or substantial governmental interest unrelated to the suppression of speech and whether the limitation of free speech rights was no greater than necessary to protect the particular governmental interest involved. (*Seattle Times*, *supra*, 467 U.S. at p. 32.) In answering those questions, the court noted that because the discovery process is solely a matter of "legislative grace," a litigant has no First Amendment right of access to information made available only for purposes of trying his suit. As a result, continued court control over the discovered information does not pose the same threat of government censorship that might exist in other situations. The court also pointed out that because discovery material is not a public component of trial, the protective order did not restrict a traditionally public source of information. And, because the newspaper could publish material obtained independent of the court's processes, free speech rights were less implicated. (*Id.* at p. 33.) Permitting restrictions on the dissemination of information obtained through pretrial discovery allowed parties to obtain information relevant to their case, while preventing potential abuse, such as use of the information to smear a person or invade his privacy.

---

[12] As part of this argument, plaintiffs also contended during oral argument that petitioners were not signatories of the stipulation that led to the order appointing Judge Lichtman as the mediator. This suggests, they contend, that the petitioners could not have been participants in a mediation to which they never agreed. The signed stipulation is not in the record, however, and plaintiffs have not made an attempt to augment the record to include that document. We even contacted the superior court clerk's office in an unsuccessful effort to obtain a copy of that stipulation. Assuming for discussion's sake only that petitioners did not sign the stipulation, that fact is not determinative and would not change our decision.

■ When a protective order is issued on a showing of good cause and limits only the dissemination of information learned through discovery, and not other sources, the First Amendment is not violated. (467 U.S. at p. 37.)

In applying this rule, the court in *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718 [40 Cal.Rptr.2d 299] (*Candiotti*), differentiated between materials obtained through discovery, and information obtained elsewhere. The ex-wife in a family law custody and visitation proceeding appealed from an order prohibiting her from disseminating information she learned about her former husband's new wife. The appellate court affirmed the order as to information obtained through discovery, but reversed the order as to information learned independently of the discovery process. (*Id.* at p. 724.) Plaintiffs contend that *Seattle Times* does not apply here because the proffers were prepared voluntarily by the Archdiocese, independent of the discovery process.

We do not believe plaintiffs have properly briefed the issues they have placed before us. Plaintiffs' argument is really an attack on the constitutionality of sections 1119, subdivision (c), and 1122, subdivision (a)(2). As in *Seattle Times, supra,* 467 U.S. 20, we believe such an argument would, at a minimum, have to address the governmental interests served by mediation confidentiality and an analysis that distinguished information obtained solely by virtue of the mediation process from information obtained solely by virtue of pretrial discovery. (See *Grove Fresh Distributors, Inc. v. John Labatt, Ltd.* (N.D.Ill. 1995) 888 F.Supp. 1427, 1440–1441 [nothing in *Seattle Times* suggests it was limited to pretrial discovery and no First Amendment violation existed as to protective order barring release of confidential settlement agreement; there was no legitimate public interest in disclosing settlement agreements because confidential settlement agreements best serve the interests of the public and the parties].) Plaintiffs have failed to do so, and we therefore deem the issue waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 [46 Cal.Rptr.2d 119].)[13]

Alternatively, we reject on the merits the prior restraint issue as framed by plaintiffs. Pointing to *Candiotti, supra,* 34 Cal.App.4th 718, plaintiffs contend a prior restraint exists because the proffers were derived independently of pretrial discovery processes. We believe their reliance on *Candiotti* is misplaced. The information obtained independently of the discovery process in that case came from an anonymous phone tipster. (*Id.* at pp. 720–721.)

---

[13] We also question whether plaintiffs have standing to raise this issue. The proffers were prepared by the church, and it alone presumably possesses the power to disclose the proffers under section 1122, subdivision (a)(2). If there were a prior restraint, it appears that the church alone would be affected by it, but the church has never raised that issue. Because the standing issue was not raised either below or during this writ proceeding, we do not reach it.

In contrast, the process by which the proffers were created is both derivative of and analogous to traditional pretrial discovery. Plaintiffs initially tried to obtain the information contained in the proffers through formal discovery. They admit that before these actions were coordinated, they propounded a formal document production request (former Code Civ. Proc., § 2031) on the Archdiocese on behalf of one of the *Clergy Cases I* plaintiffs. The Archdiocese responded to that request with various objections. Once the actions were coordinated, all proceedings, including discovery, were stayed. The church's objections to the formal document request were never ruled upon. The proffer protocol was devised as a way for the church to provide information about the notice issue without actually disclosing the files as to which its objections were raised, and without waiving those objections. Compliance with that procedure was compelled by various court orders. Before the files and proffers were produced to Judge Olson, the court also ordered the church to give notice to the affected priests pursuant to the consumer records document subpoena provisions of Code of Civil Procedure section 1985.6. As part of that order, the court noted that plaintiffs had requested the documents from the Archdiocese. In short, the proffers were used by the parties as a substitute for formal discovery, they were very much a creature of the court's processes, and the information contained in the proffers could not have been obtained without that process.[14] (*Seattle Times, supra,* 467 U.S. at p. 33.) For purposes of the *Seattle Times* rule, we see no real difference between information that was provided in this manner as opposed to through formal discovery. Because plaintiffs' prior restraint argument rests on the fact that the proffers were not produced by way of formal discovery, and because we hold that on the facts of this case, the proffer protocol was not substantively different from such discovery, the prior restraint argument fails.

3. *Our Opinion Does Not Prohibit the Release of the Underlying Information Contained in the Proffers*

Although we have concluded that the First Amendment is not implicated by an order barring the release of the proffers themselves, we recognize the significant public interest in the underlying subject matter of this litigation in

---

[14] At a September 23, 2003, hearing, plaintiffs' counsel addressed the status of the proffer protocol. As part of his comments, counsel said: "We felt all along that if we simply we have done a document request [*sic*]. We have had the answers. We just went through the demand for production and then the motion to compel that ultimately we would prevail on those issues and the documents would all be made public and we would have the opportunity to receive all the documents not just the proffers. But in order for this process to succeed we would agree at least up to this point and time to obtain the proffers with the court acting as intermediary to review them and make sure of their accuracy and completeness." As we view this statement, plaintiffs' counsel believed he could have obtained all the documents underlying the proffers through traditional discovery methods and viewed the proffers as a substitute for such discovery, so long as the proffers were accurate and complete.

general and of the Archdiocese's knowledge of its priests' sexual conduct in particular. Our opinion should not be construed as prohibiting or restricting release of the underlying information used in the creation of the proffers. That information existed well before the mediation proceedings here—indeed well before the present litigation was commenced.

■ The distinction we draw has its roots in *Seattle Times* itself. There, the United States Supreme Court upheld a protective order that barred the release of information the newspaper had obtained through formal discovery. Nevertheless, the court acknowledged a significant constitutional limitation on the reach of protective orders. "As in this case, such a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." (*Seattle Times, supra*, 467 U.S. at p. 34.)

In the context of the proffers at issue here, nothing in our decision today limits the Archdiocese from releasing information contained in the underlying personnel or other files that it has maintained. Our holding deals with only the specific written proffers developed through mediation. This distinction is supported both by statute and California case law. Under section 1120, subdivision (a), "[e]vidence otherwise admissible or subject to discovery . . . shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation." In *Rojas, supra,* 33 Cal.4th at page 423, footnote 8, the court held that even though witness statements prepared as part of a mediation are protected under section 1119, the facts set forth in those statements are not shielded from disclosure. Otherwise, parties could use mediation as a pretext to shield materials from disclosure. Accordingly, our decision applies to only the proffers themselves, not to the underlying sources of information from which the proffers were derived, subject to any applicable rights or privileges that might be asserted to prevent the release of such information.

Finally, we acknowledge that we have not had the occasion to address the merits of any of the other privileges or other reasons that petitioners might assert to preclude the release of the underlying information. That issue awaits another day.

## DISPOSITION

For the reasons set forth, *ante*, the order denying petitioners' motion for a protective order is reversed. Let a writ of mandate issue directing the trial court to enter a new and different order granting that motion and prohibiting the Archdiocese from publicly disclosing the proffers. Petitioners to recover their appellate costs.

Cooper, P. J., and Flier, J., concurred.